T.C. Memo. 1997-314


UNITED STATES TAX COURT


ROBERT GOTTSEGEN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 23766-93, 19554-94.          Filed July 8, 1997.


Robert Gottsegen, pro se.

Mary P. Hamilton, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[1]

---

[1] Unless otherwise indicated, all section references are to
(continued...)

The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  Respondent determined deficiencies and accuracy-related penalties with respect to petitioner's Federal income taxes for the years and in the amounts as shown below:

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1989 | $34,823 | $6,965 |
| 1990 | 1,196 | 239 |

The present cases are a part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling group of cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The underlying transactions involving the Sentinel recyclers in the present cases are substantially identical to the transactions in Provizer v. Commissioner, supra.

Consistent with the resolution of some of the disputed issues in Provizer v. Commissioner, supra, the parties filed a Stipulation of Settled Issues concerning the adjustments related

_____

(...continued)
the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

to petitioner's participation in the Plastics Recycling Program. The stipulation states in pertinent part as follows:

1. Petitioner is not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on his tax returns as a result of his participation in the Plastics Recycling Program.

2. This stipulation resolves all issues that relate to the items claimed on petitioner's tax returns resulting from his participation in the Plastics Recycling Program with the exception of petitioner's liability for additions to the tax under the applicable provisions of Section 6662(a).

After the foregoing stipulation, the issue remaining for decision is whether petitioner is liable for accuracy-related penalties under section 6662(a) for 1989 and 1990. The resolution of this issue turns on whether, for 1989, a substantial valuation misstatement or a substantial understatement of income tax exists for such year, or whether, for 1989 and 1990, petitioner was negligent.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. Petitioner resided in Bermuda at the time that his petition was filed with the Court.

A. The Plastics Transactions

The present cases involve petitioner's purchase of a Sentinel expanded polyethylene (EPE) recycler in 1981 and two Sentinel expanded polystyrene (EPS) recyclers in 1982.

Transactions involving the Sentinel EPE recycler were considered in Provizer v. Commissioner, supra. Petitioner has stipulated to substantially the same facts concerning the underlying transactions as were found in Provizer, with the exception of certain facts concerning (1) the Provizers, (2) the expert opinions, (3) the value of the Sentinel EPE recycler, and (4) other matters that we regard as having minimal significance. The facts concerning the transactions as found in Provizer may be summarized as follows:

Packaging Industries, Inc. (PI) manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F&G Corp. for $1,162,666 each. F&G Corp. then leased the recyclers to the Clearwater Group partnership, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. PI allegedly sublicensed the recyclers to entities (the end-users), which would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for payment from FMEC Corp. based on the quality and amount of recycled scrap.

All of the foregoing transactions were executed simultaneously.

The sale of the recyclers from PI to ECI Corp. was financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F&G Corp. was paid in

cash and the remainder was financed through notes. The notes provided that 10 percent of the amount thereof was recourse but that the recourse portion was due only after the nonrecourse portion had been paid in full. All of the monthly payments required among the entities in the above transactions offset each other.

In Provizer v. Commissioner, supra, we found that the market value of a Sentinel EPE recycler in 1981 did not exceed $50,000 and that the nuts and bolts, or manufacturing, cost was $18,000. Other recycling machines were commercially available during the years in issue in Provizer, including the Buss-Condux Plastcompactor, Nelmor/Weiss Densification System (Regenolux), Cumberland Granulators, and Foremost Densilator. Information regarding these other machines was readily available.

B.   Petitioner and His Introduction to the Plastics Transactions

Petitioner received a bachelor of science degree from New York University and has completed post-graduate courses at Harvard University.

Petitioner is a businessman who was active in the plastics industry from at least 1958 until 1989. At one time or another during his career as a business executive, petitioner has been the chief executive officer (CEO) of approximately 12 different plastics-related companies, which collectively employed many individuals. In 1981 and 1982 in particular, petitioner was the CEO of Gotham Chicago Corp. (Gotham Corp.), a steam chest molding

operation once owned by petitioner's family.  During these years petitioner was also actively involved in running several privately held corporations.

In addition to gaining experience as a CEO and business executive, petitioner learned about plastic commodities, plastic resins, and petrochemicals.  Petitioner has purchased millions of dollars of plastic processing machinery and, except for the recyclers that petitioner purchased in 1981 and 1982, has never paid more than several hundred thousand dollars for an individual piece of equipment.  Tax credits and benefits were important considerations to petitioner in purchasing plastics-processing equipment.

Some of the companies in which petitioner was actively involved, Gotham Corp. in particular, experienced problems with the disposal of expanded polystyrene scrap.  Expanded polystyrene is a highly porous form of polymer that can be produced in various grades or densities.  The density of expanded polystyrene varies inversely with the volume of trapped gases within the polymer.  The gases trapped in the polymer are volatile.  Gotham Corp. generated large quantities of expanded polystyrene that were bulky and volatile.  Local landfills and dumps became unwilling to accept the expanded polystyrene scrap generated by Gotham Corp., thereby creating disposal problems for petitioner.

In the mid-1970's petitioner became acquainted with Elliot I. Miller (Miller), a practicing attorney experienced in tax

matters and corporate counsel to PI. Miller knew a number of attorneys, accountants, and business executives, some of whom were involved in the plastics industry. Miller put petitioner in contact with John D. Bambara (Bambara), whom petitioner had known since 1976, Raymond Grant (Grant), and Harris W. Freedman (Freedman).

Bambara is the president of PI,[2] a closely held corporation that manufactures thermoplastic and other types of packaging machinery. PI holds itself out as the world's largest manufacturer of blister packaging machinery and as fabricating the industry's widest line of thermoforming machinery, including highly specialized disposable medical and food packaging systems. PI also manufactures the Sentinel polyethylene (EPE) and polystyrene (EPS) recyclers, which recycle expanded polyethylene and expanded polystyrene, respectively.

Grant is a New York investment banker, attorney, and accountant. Grant is president of ECI, as well as the 100-percent owner of its stock.

Freedman is a certified public accountant in New York and is also the president and chairman of the board of F&G Corp..[3]

---

[2] Bambara, together with his wife and daughter, owns 100-percent of the stock of PI. Bambara is also the president, director, and 100-percent owner of FMEC Corp.

[3] F&G Corp. was organized in 1979 as an S Corp. and was originally owned equally by Grant and Freedman. In the early 1980's, Miller reorganized F&G as a subchapter C Corp. to act as

(continued...)

In the spring of 1981, Grant had a discussion with Miller regarding energy tax credits for recycling equipment. Sometime after this discussion, petitioner was considering the installation of energy-saving equipment at one of his companies and contacted Miller to discuss available tax credits. Petitioner asked Miller whether PI had any equipment that could be used to take advantage of tax credits.

Miller contacted Bambara to discuss the idea. Bambara told Miller about a recycler prototype that Bambara thought might be suitable for a venture centering around benefits from tax credits. Miller then arranged for an organizational meeting including Miller, Bambara, Grant, petitioner, and Anthony Giovannone, the executive vice president of PI.

At the organization meeting, Bambara discussed the recycling equipment that PI had developed in response to PI's actual or potential problems with scrap disposal. Bambara referred to PI's ability to manufacture recyclers, and he mentioned PI's proprietary interest in the prototype recycler.

---

[3](...continued)
a safe-harbor lessor and to satisfy the requirements of sec. 168(f). Ultimately, Freedman reduced his ownership interest in F&G to 9.1 percent, and Grant sold his entire interest. At some point in time not disclosed in the record, 10 new shareholders were admitted to F&G, including Miller and petitioner. Miller and petitioner each have a 9.1 percent ownership interest in F&G.

1.  Petitioner's Purchase of the Sentinel EPE Recycler

Shortly after the organizational meeting, petitioner viewed a prototype Sentinel EPE recycler.  At the time, none of the plastics-related companies in which petitioner was actively involved generated expanded polyethylene scrap.

Bambara told petitioner that Sentinel EPE recyclers were unique because no other machine could recycle expanded polyethylene.  Petitioner allegedly contacted manufacturers of plastics-processing equipment and inquired whether such manufacturers possessed equipment that could successfully recycle expanded polyethylene.  According to petitioner, the manufacturers "had all sorts of reservations and no * * * firm assertions."  Also, petitioner allegedly "looked around the industry [and] didn't see any machine" successfully recycling expanded polyethylene.

At Miller's direction, petitioner retained Stanley Ulanoff (Ulanoff) and Samuel Burstein (Burstein) to issue marketing and technical opinions, respectively, regarding the Sentinel EPE recycler.  Petitioner did not think that he needed Ulanoff's and Burstein's opinions in order to make an informed decision regarding the Sentinel EPE recycler.  In this regard, petitioner testified:

> I hired * * * [Ulanoff and Burstein] because I was told
> to hire them.  I really didn't need them to tell me
> what the machine could do and the what -- the profit I
> could make. * * *  Elliot Miller told me this is the
> way you do it.  I did it.

The record reveals little information about Ulanoff and Burstein other than the fact that both were investors in Sentinel recyclers. There is no indication that either Ulanoff or Burstein had any expertise in the plastics industry or that they retained a plastics expert to help them analyze petitioner's purchase of the Sentinel EPE recycler.

Petitioner also retained the law firm of Windells, Marx, Davis & Ives (WMDI) to issue a legal opinion. On October 15, 1981, WMDI issued a legal opinion to petitioner. The opinion was not introduced into evidence at the trial of the present cases.

Petitioner apparently retained WMDI because WMDI's tax department, headed by John Y. Taggart (Taggart), was preparing the legal opinion for the closings for all of the Sentinel EPE recyclers manufactured by PI in 1981. Taggart, in addition to being the head of the WMDI's tax department, was an adjunct professor at New York University and had previously been employed by the U.S. Department of the Treasury. Taggart also owned a 6.66-percent interest in a second-tier Plastics Recycling partnership.

There is no evidence in the record that Taggart or any other member of WMDI had any expertise in the plastics industry. Further, there is no evidence in the record that WMDI retained experts in the plastics industry to help the firm analyze and assess petitioner's purchase of the Sentinel EPE recycler.

On October 7, 1981, in a series of transactions similar to those of the Clearwater Group partnership in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), petitioner purchased outright one Sentinel EPE recycler from ECI Corp. for $1,162,667.[4] As prearranged, petitioner leased the recycler to FMEC Corp. Thus, the significant transactions of petitioner's purchase of the Sentinel EPE recycler differ from the underlying transactions in <u>Provizer</u> in the following respects: (1) The form of petitioner's interest in the equipment; (2) the entity from which petitioner's interest was obtained; (3) the fact that equipment was leased, rather than licensed, to FMEC Corp.; and (4) the number of machines sold, leased, licensed, and sublicensed.

As of October 7, 1981, there was no established market for operating Sentinel EPE recyclers.

Petitioner never made a profit in any year from his Sentinel EPE recycler.

2.    <u>Petitioner's Purchase of the Sentinel EPS Recyclers</u>

In 1982, PI manufactured Sentinel EPS recyclers which recycled expanded polystyrene. Bambara showed petitioner the blueprints of the machine and explained to petitioner that the

---

[4] Petitioner purchased the Sentinel EPE recycler for cash in the amount of $43,700 and notes in the amount of $1,118,967. It does not appear that petitioner made any payments on the note.

Sentinel EPS recycler could recycle expanded polystyrene into a densified, devolatized polystyrene and would simultaneously preserve the physical properties of polystyrene. Petitioner personally observed a Sentinel EPS recycler in operation.

Petitioner retained Ulanoff and Burstein to issue marketing and technical opinions, respectively, regarding the Sentinel EPS recyclers.

Petitioner also retained the law firm of Boylan & Evans to issue a legal opinion regarding the Sentinel EPS recyclers. William A. Boylan (Boylan) and John D. Evans (Evans) were formerly partners at WMDI before leaving in 1982 and forming their own law firm. Boylan & Evans issued a legal opinion on December 1, 1982.

There is no evidence in the record that any member of Boylan & Evans had any expertise in the plastics industry or retained plastic experts to assist the firm in evaluating petitioner's purchase of the Sentinel EPS recyclers.

Petitioner consulted with Miller regarding the details of petitioner's purchase of the Sentinel EPS recyclers. On September 17, 1982, Miller organized Resin Recyclers, Inc. (RRI), an S corporation wholly owned by petitioner, which was specifically created for the Sentinel EPS recycler transactions.

RRI was designed to be a joint venturer with PI and partnerships investing in the Sentinel EPS recyclers. In theory, RRI was to place Sentinel EPS recyclers with end-users, and to

arrange for any scrap produced by the end-users to be further reprocessed and sold. PI agreed to maintain and repair the machines.

On December 1, 1982, in a series of transactions similar to those of the Clearwater Group partnership in Provizer v. Commissioner, supra, petitioner purchased two Sentinel EPS recyclers for a total of $3,500,000.[5] Petitioner then entered into a joint venture agreement with RRI and PI for the "exploitation" of his recyclers. Thus, the significant transactions of petitioner's purchase of the Sentinel EPS recyclers differ from the underlying transactions in Provizer in the following respects: (1) The form of petitioner's interest in the equipment; (2) the entity from which petitioner's interest was obtained; (3) petitioner's participation in a joint venture after purchasing the recyclers; and (4) the number of machines sold, leased, licensed, and sublicensed.

Petitioner, as the sole owner of RRI, was responsible for placing his Sentinel EPS recyclers with end-users. Because petitioner was also responsible for placing other investors' Sentinel EPS recyclers with end-users, he could not place his recyclers in the most profitable locations; i.e., locations with the most expanded polystyrene to recycle. Rather, the most

---

[5] Petitioner purchased the Sentinel EPS recyclers for cash in the amount of $135,000 and a note in the amount of $3,365,000. It does not appear that petitioner made any payments on the note.

profitable locations were reserved for the other Sentinel EPS recyclers owned by other investors.

Petitioner received "hundreds and hundreds" of complaints regarding the recyclers for which RRI was responsible, including the two recyclers that he owned. The end-users complained that the machines did not work; that they had fires; that too much labor was involved; and that PI was not maintaining and repairing the recyclers. Petitioner "couldn't get someone to maintain the equipment" and began to feel that the investment was "hopeless" after "about 400 phone calls and pleadings and meetings." Petitioner never profited in any year from his Sentinel EPS recyclers, a fact that petitioner attributes to PI's alleged failure to repair and maintain the recyclers.

At the time of trial, petitioner could not recall the names of the companies with which he placed his recyclers. When asked at trial if he knew where his Sentinel EPE and EPS recyclers were presently located, petitioner replied that he did not have the "vaguest idea" and that they had been "abandoned" by him because PI would not maintain them.

At the time that petitioner purchased the Sentinel EPS recyclers, there was no established market for such recyclers.

C.   Expert Testimony

The parties did not agree on the value of either the Sentinel EPE or EPS recyclers, and petitioner did not stipulate

to be bound by the value of the Sentinel EPE recyclers that we found in Provizer v. Commissioner, supra.

At trial, petitioner did not offer expert testimony regarding the value of either the Sentinel EPE or EPS recyclers. In contrast, respondent offered expert testimony from Steven Grossman (Grossman) and Richard S. Lindstrom (Lindstrom). Although respondent's experts submitted reports concerning the value of both the Sentinel EPE and EPS recyclers, the expert's testimony at trial focused on the value of the Sentinel EPS recyclers.

### 1. Grossman

Grossman is a professor in the Plastics Engineering Department at the University of Massachusetts at Lowell. He has a doctorate degree in Polymer Science and Engineering from the University of Massachusetts and a bachelor of science degree in chemistry from the University of Connecticut. He also has approximately 15 years of experience in the plastics industry, including over 4 years' experience as a research and development scientist at the Upjohn Co. in its Polymer Research Group.

Grossman is also a partner in the law firm of Hayes, Soloway, Hennessey, Grossman & Hage, P.C., which firm practices in the area of intellectual property, including patents, trademarks, copyrights, and trade secret protection.

Grossman's reports concerning the value of the Sentinel EPE and EPS recyclers were very similar, and we discuss them

together. Grossman's reports discuss the limited market for the recycled plastic material. Grossman concluded that the Sentinel EPE and EPS recyclers were unlikely to be successful products because of the absence of any new technology, the absence of a continuous source of suitable scrap, and the absence of any established market. Grossman suggested that a reasonable comparison of the products available in the polyethylene industry in 1981, and in the polystyrene industry in 1982, with the Sentinel EPE and EPS recyclers, respectively, reveals that the Sentinel recyclers had very little commercial value and were similar to comparable products available on the market in component form. For these reasons, Grossman opined that the Sentinel EPE and EPS recyclers did not justify the "one-of-a-kind" price tag that they carried.

Specifically, Grossman reported that there were several machines on the market as early as 1981 that were functionally equivalent to, and significantly less expensive than, both the Sentinel EPE and EPS recyclers. These machines included: (1) The Japan Repro recycler, available in 1981 for $53,000; (2) the Buss-Condux Plastcompactor, available before 1981 for $75,000; (3) the Foremost Machine Builders' "Densilator", available from 1978-1981 for $20,000; and (4) the Midland Ross Extruder, available in 1980 and 1981 for $120,000. Grossman added that all of these machines were "widely available".

Grossman examined both the Sentinel EPS recycler and a Japan Repro recycler and found that the construction of the two machines was "nearly identical". Further, Grossman concluded that the recycled polystyrene produced by both machines would also be nearly identical. In Grossman's opinion, neither the Japan Repro recycler nor the Sentinel EPS recycler represented "a serious effort at recycling" because the end-product from both machines was not completely devolatized and required further processing. It was also Grossman's opinion that an individual who seriously wanted to recycle would not purchase either of these machines.

Grossman's opinion regarding the Sentinel EPE recycler was based on the descriptions of such recycler as set forth in the writings of other professionals. He neither tested nor examined the Sentinel EPE recycler.

Grossman's opinion regarding the Sentinel EPS recycler was based on his personal examination of a Sentinel EPS recycler, as well as the descriptions of such recyclers as set forth in the writings of other professionals . Grossman did not, however, observe the Sentinel EPS recycler in actual operation.

Finally, Grossman reported on the relationship between the plastics industry and the petrochemical industry. Grossman noted that although the development of the petrochemical industry is a contributing factor in the growth of the plastics industry, the two industries have a "remarkable degree of independence".

Grossman observed that the "oil crisis" in 1973 triggered "dire" predictions about the future of plastics that had not been fulfilled in 1981.  Grossman stated that the cost of a plastic product depends, in large part, on technology and the price of alternative materials.  Grossman's studies concluded that a 300-percent increase in oil prices results in a 30-40 percent increase in the cost of plastic.

Grossman did not specifically value either the Sentinel EPE Recycler or the Sentinel EPS Recycler.  However, as previously stated, Grossman concluded that existing technology was available that provided equivalent capability of recycling polyethylene and polystyrene.  Specifically regarding the Sentinel EPS recycler, Grossman also concluded that recycling equipment that achieved the same result as the Sentinel EPS recycler sold for about $50,000 during the relevant period.

2.    Lindstrom

Lindstrom graduated from Massachusetts Institute of Technology with a bachelor's degree in chemical engineering. From 1956 until 1989 Lindstrom worked for Arthur D. Little, Inc. in the areas of process and product evaluation and improvement and new product development, with special emphasis on plastics, elastomers, and fibers.  At the time of trial, Lindstrom continued to pursue these areas as a consultant.

In his report, Lindstrom determined that several different types of equipment capable of recycling expanded polyethylene

were available and priced at approximately $50,000 in 1981. Similarly, Lindstrom determined that several different types of equipment capable of recycling expanded polystyrene were available and priced between $25,000 and $100,000 in 1982. Lindstrom found that, based on his research, "there were available in 1981 commercial units that could be purchased for $50,000 or less that were totally equal to the Sentinel EPE recycler in function, product quality, and capacity."  With respect to the Sentinel EPS recycler, Lindstrom stated that "several machines were available that could reprocess expanded polystyrene into higher quality, more useful, higher value product and these machines or processing systems cost $50,000 to $100,000 in 1982."

Lindstrom examined the Japan Repro recycler, the Buss-Condux Plastcompactor, and the Nelmor Regenolux.  Lindstrom found that these machines were functionally equivalent to the Sentinel EPS recycler and were available in the years and at the prices reported by Grossman, detailed supra.  Lindstrom also reported that various equipment companies, such as the Cumberland Engineering Division of John Brown Plastics Machinery, were willing to provide customized recycling programs to companies at a minimum cost of $50,000.

Lindstrom found that in "average-use situations", the Sentinel EPE recycler could process 200 pounds of plastic per

hour and the Sentinel EPS recycler could process between 100 and 200 pounds of plastic per hour.

Lindstrom observed a Sentinel EPE recycler in operation at PI, and he was allowed to take photographs of the recycler and look at its blueprints. Based on his observations and study, Lindstrom estimated the manufacturing cost of the Sentinel EPE recycler to be approximately $20,000. Lindstrom concluded that the market value of the Sentinel EPE recycler did not exceed $50,000.

Lindstrom observed a Sentinel EPS recycler in operation and was allowed to inspect the machine closely. Lindstrom estimated the manufacturing cost of the Sentinel EPS recycler to be approximately $20,000 and market value of the machine to be approximately $25,000.

D.   Petitioner's Federal Income Tax Returns

On his 1989 and 1990 individual income tax returns (Forms 1040), petitioner claimed that his Sentinel EPE recycler had a basis of $1,162,667, and that his Sentinel EPS recyclers had an aggregate basis of $3,500,000. Also on his 1989 and 1990 returns, petitioner claimed a depreciation deduction (and a net loss) in the amount of $89,842 per year with respect to his Sentinel EPE recycler.[6]   Finally, petitioner claimed net

---

[6] Petitioner did not claim any depreciation deductions for his Sentinel EPS recyclers on his 1989 and 1990 returns because he had fully depreciated those recyclers on his returns for prior
                                                      (continued...)

operating loss (NOL) deductions in the amount of $2,240,458 and $2,200,426, on his 1989 and 1990 income tax returns, respectively, with respect to his Sentinel EPE and EPS recyclers. The NOL deductions represented carryforwards of NOL's claimed by petitioner for the taxable years 1983 through 1988.

E.  The Notices of Deficiency

In the notices of deficiency, respondent disallowed all items of loss, deductions, and credits related to the Sentinel recyclers and increased petitioner's income accordingly.

In addition, respondent determined that, for 1989, petitioner was liable for the accuracy-related penalty under section 6662(a) based on: (1) Negligence; (2) substantial understatement of income tax liability; and (3) substantial valuation misstatement.  See sec. 6662(b)(1), (2), and (3). Respondent also determined that, for 1989 and 1990, petitioner was liable for the accuracy-related penalty based on negligence. See sec. 6662(b)(1).

---

[6](...continued)
years based on a 5-year recovery period and had therefore already recovered the purported purchase price of those machines; i.e., $3,500,000.

Depreciation deductions for petitioner's Sentinel EPS recyclers served to give rise to, or to increase, net operating losses claimed by petitioner on returns for years prior to those in issue, which net operating losses were carried forward to the years in issue.  In this regard, see the discussion in the text, infra.

F.   Petitioner's Contentions

   1.   The Sentinel EPE Recycler

   Petitioner contends that he was interested in the Sentinel EPE recycler "within the context of an investment opportunity". In this regard, petitioner further contends that he determined that the effect of rising oil prices in the plastics industry would make recycling expanded polyethylene a profitable activity and that, because plastic is an oil derivative and further because the United States was experiencing an oil-crisis in 1981, the recycled expanded polyethylene would be a valuable commodity.

   Petitioner contends that he made financial projections in order to determine the annual cash flow that he could expect from a Sentinel EPE recycler.  In this regard, petitioner contends that in calculating his income stream, he assumed the following: (1) The machine could process between 200 and 400 pounds of recycled expanded polyethylene per hour for 7,000 hours per year; and (2) the price of oil would continue to rise, increasing the price of polyethylene resin, such that petitioner would profit 20 to 30 cents per pound.  From this calculation, petitioner contends that he concluded that he could purchase a Sentinel EPE recycler and reasonably expect to make a profit.

   2.  The Sentinel EPS Recyclers

   Petitioner contends that he was interested in recycling expanded polystyrene for two reasons:  (1) To solve his expanded polystyrene disposal problem; and (2) to make a profit.   In this

regard, petitioner contends that he "scrutinized the market for availability of machinery that could [recycle] polystyrene, looked at equipment that was available, [and] came to the informed conclusion that there was no machine available that could do what John Bambara convinced me his machine could do." Petitioner contends further that he observed the Japan Repro recycler in operation and concluded that the machine did not successfully recycle expanded polystyrene in that it densified, but did not completely devolatize, expanded polystyrene, so that the recycled product did not have the physical properties of polystyrene that he needed in order to make a "commercially acceptable product."

Although petitioner allegedly researched other, less expensive recycling machinery manufactured by Nelmor Co., Cumberland Engineering, and Foremost Machine Builders, Inc., petitioner was unable to recall the names and models of the equipment that he researched, but contends that, in 1982, he was not aware of any machinery manufactured by these companies that could recycle expanded polystyrene.

As with expanded polyethylene, petitioner contends that he determined that the effect of rising oil prices on the plastics industry would make recycled expanded polystyrene a valuable commodity. In this regard, petitioner contends that he made financial projections in order to determine the annual cash flow that he could expect from a Sentinel EPS recycler. From these

financial projections, which mirrored those made for the Sentinel EPE recycler, petitioner contends that he concluded that he could purchase two Sentinel EPS recyclers and reasonably expect to make a profit.

G.    Ultimate Finding of Fact

At all relevant times, the fair market value of the Sentinel EPE recycler and the Sentinel EPS recycler did not exceed $50,000 per machine.

OPINION

A.    Background

We have decided many Plastics Recycling cases.  The majority of these cases, like the consolidated cases herein, presented issues regarding additions to tax for negligence and valuation overstatement.  See Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n. 13 (and cases cited therein).

In Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), a test case for the Plastics Recycling group of cases, this Court: (1) Found that each Sentinel EPE recycler had a fair market value not in excess of $50,000; (2) held that the transaction, which was almost identical to the transactions in the present cases, was a sham because it lacked economic substance and a business purpose;

(3) upheld the additions to tax for negligence under section 6653(a)(1) and (2); (4) upheld the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers; and (5) held that losses and credits claimed with respect to the Clearwater Group partnership were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioner has not agreed to be bound by Provizer v. Commissioner, supra, petitioner has stipulated that his purchase of the Sentinel EPE and EPS recyclers is similar to the acquisition of the Sentinel EPE and EPS recyclers described in Provizer. The underlying transactions in the present cases, as well as the Sentinel EPE recycler in the present cases, represent the same type of transaction and same type of machine considered in Provizer. Set against this background, we consider whether petitioner is liable for the accuracy-related penalties for 1989 and 1990.

Section 6662(a) imposes an addition to tax equal to 20 percent of the underpayment of tax attributable to, inter alia, (1) Negligence or disregard of rules or regulations, or (2) any substantial understatement of income tax, or (3) any substantial

valuation misstatement.  Sec. 6662(b)(1)-(3).  The term "underpayment of tax" is defined by section 6664(a) to mean, as relevant herein, the amount by which the income tax imposed by law exceeds the amount of income tax reported by the taxpayer on the taxpayer's income tax return.

Also as relevant herein, the accuracy-related penalty does not apply with respect to any portion of the underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c)(1).  The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability for the year.  Id.

Petitioner bears the burden of proving that respondent's determination of the accuracy-related penalty is erroneous.  Rule 142(a); INDOPCO Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, in evaluating evidence, the Court is not bound to accept as gospel, the unverified and undocumented testimony of a taxpayer. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

B.   Substantial Valuation Misstatement

In the notice of deficiency for 1989, respondent determined that the accuracy-related penalty should be imposed based on either a substantial valuation misstatement or a substantial understatement of income tax or negligence.  We begin with whether there was a substantial valuation misstatement for 1989.

As relevant herein, section 6662(e) provides that there is a substantial valuation misstatement if the value or adjusted basis of any property claimed on a return is 200 percent or more of the amount determined to be the correct amount.  Sec. 6662(e)(1)(A).  Also, as relevant herein, section 6662(e) does not apply unless the portion of the underpayment attributable to the substantial valuation misstatement exceeds $5,000.  Sec. 6662(e)(2).

Respondent contends that the adjusted basis of the Sentinel EPE and EPS recyclers claimed by petitioner on his 1989 return exceeds by at least 200 percent, the fair market value of the recyclers.  Petitioner bears the burden of proving that respondent's determination is erroneous.  Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

1.   The Sentinel EPE Recycler

In order to establish the market value of the Sentinel EPE recycler, respondent presented the testimony and expert witness reports of Grossman and Lindstrom.  Opinions of experts are not binding on this Court and may be rejected entirely if contrary to

our judgment.  <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282 (1938); <u>Laureys v. Commissioner</u>, 92 T.C. 101, 122-129 (1989); <u>Chiu v. Commissioner</u>, 84 T.C. 722, 734 (1985).

In the present cases, petitioner declined to stipulate to the value of the Sentinel EPE recycler at issue.  However, petitioner presented no evidence by way of expert testimony to contradict the findings made by respondent's experts.  In fact, the following exchange at trial constitutes petitioner's primary testimony regarding the value of the Sentinel EPE recycler:

Q:  Before you purchased the EPE recycler in 1981, what did you do to determine whether or not it was worth $1.1 million?

A:  I really can't expand too readily on what I previously said.  I looked around the industry [and] didn't see any machine that was [successfully recycling expanded polyethylene].

Petitioner provided few details regarding the equipment that he researched and investigated.  Indeed, the record is devoid of any evidence indicating that petitioner conducted a meaningful investigation to value the Sentinel EPE recycler.

In contrast, Lindstrom based his evaluation on a comparison between the Sentinel EPE recycler and the other commercially available machines.  Lindstrom estimated the market value of the Sentinel EPE recycler at approximately $50,000 and estimated the manufacturing cost to be in the range of $20,000.  Lindstrom came to his conclusion based on a survey of competing machines and his personal observation of the machines.

Lindstrom's statements of his opinion and the basis for it were reasonable and persuasive, and we rely heavily on his expert report and testimony in making our finding of fact regarding valuation.

Grossman did not specifically value the Sentinel EPE Recycler. However, Grossman concluded that existing technology was available that provided equivalent capability of recycling polyethylene. We found Grossman to be an impressive witness, and we also rely heavily on his expert report and testimony in making our finding of fact regarding valuation.

We have found as an ultimate fact that the Sentinel EPE recycler purchased by petitioner in 1981 did not have a fair market value at that time in excess of $50,000.[7] Having so found, it follows that the adjusted basis of the Sentinel EPE recycler claimed by petitioner on his returns is by definition overstated within the meaning of section 6662(e).

2. The Sentinel EPS Recyclers

In order to establish the fair market value of the Sentinel EPS recyclers, respondent also presented the testimony and expert witness reports of Grossman and Lindstrom.

---

[7] We observe that our finding is consistent with the finding in Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), regarding the fair market value of the Sentinel EPE recycler.

Grossman testified that, in 1982, equipment comparable to the Sentinel EPS recycler was "widely available" and significantly less expensive. Grossman examined a Sentinel EPS recycler and a Japan Repro recycler and determined that the mechanical construction of the two machines was "nearly identical". Grossman further concluded that the recycled polystyrene produced by these machines would also be identical. Grossman added that because of the existence of functionally equivalent machines, the Sentinel EPS recycler did not add new technology to the field of recycling and could not therefore justify the "one-of-a-kind" price tag that it carried.

Grossman did not specifically value the Sentinel EPS Recycler. However, Grossman concluded that recycling equipment that achieved the same result as the Sentinel EPS recycler sold for about $50,000 during the relevant period.

Lindstrom based his valuation on a comparison between the Sentinel EPS recycler and other commercially available machines. Lindstrom estimated the market value of the Sentinel EPS recycler at approximately $25,000 and estimated the manufacturing cost to be in the range of $20,000.

Although petitioner declined to stipulate to the value of the Sentinel EPS recyclers at issue in these cases, he failed to present any evidence by way of expert testimony that rebutted respondent's experts. Rather than present expert testimony, petitioner, on cross-examination, challenged the findings of

respondent's experts. However, we think that petitioner's attempt to discredit Grossman's and Lindstrom's findings was unpersuasive. To the contrary, we found both Grossman and Lindstrom to be qualified, impressive, and credible experts, and we rely heavily on their reports and testimony in making our finding of fact regarding valuation.

We have found as an ultimate fact that the Sentinel EPS recyclers purchased by petitioner in 1982 did not have a fair market value at that time in excess of $50,000 per machine. The purchase price of $1,750,000 per machine is therefore inflated by 35 times its actual value. Having so found, it follows that the adjusted basis of the Sentinel EPS recycler claimed by petitioner on his returns is by definition overstated within the meaning of section 6662(e).

In summary, petitioner overstated the value of his Sentinel EPE and EPS recyclers within the meaning of section 6662(e). Further, petitioner failed to present any persuasive evidence, nor are we able to conclude independently that petitioner acted with reasonable cause and good faith in valuing his recyclers. Thus, petitioner is liable for the accuracy-related penalty for 1989.

C.  Substantial Understatement of Income Tax

Respondent also determined that petitioner was liable for the accuracy-related penalty for 1989 because he substantially

understated his Federal income tax for that year.  See sec. 6662(b)(2).

As relevant herein, section 6662(a) imposes an accuracy-related penalty equal to 20-percent of an underpayment that is due to a substantial understatement of income tax.  See sec. 6662(d).  An individual substantially understates his or her income tax when the reported tax is understated by the greater of 10-percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  Tax is not understated to the extent that the treatment of the item related thereto is based on substantial authority or is adequately disclosed in the return or in a statement attached to the return.  Sec. 6662(d)(2)(B).  However, in the case of a tax shelter, (1) adequate disclosure will not serve to avoid the penalty, and (2) substantial authority will avoid the penalty only if the taxpayer reasonably believed that the tax treatment of the item by the taxpayer was more likely than not the proper treatment.  Sec. 6662(d)(2)(C).

Petitioner reported zero tax on his 1989 return.  The correct amount due, as stipulated by the parties, was $34,823.  Therefore, petitioner understated his income tax in an amount greater than $5,000 or 10-percent of the tax required to be shown on his return.

Petitioner makes no argument with regard to substantial authority or adequate disclosure, and we think that no such argument can be persuasively made.  Moreover, for the reasons

discussed in the negligence portion of this opinion, Part D, infra, we do not think that petitioner acted with reasonable cause and in good faith with respect to the substantial understatement. Accordingly, we sustain respondent's determination that petitioner is liable for the accuracy-related penalty under section 6662(a) based on the understatement of income tax for 1989.[8]

D.  Negligence

In the notices of deficiency, respondent determined that petitioner was liable for the accuracy-related penalty for negligence for both 1989 and 1990.

Negligence may be indicated by the failure (1) to make a reasonable attempt to comply with applicable provisions of the Internal Revenue Code and the supporting regulations thereunder, (2) to exercise ordinary and reasonable care in preparing a tax return, (3) to keep adequate books and records, or (4) to properly substantiate items. Sec. 1.6662-3(b) and (c), Income Tax Regs. Negligence also may be indicated by the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985).

---

[8] In view of our conclusion, we find it unnecessary to decide whether the plan or arrangement involved in the present cases constituted a "tax shelter" within the meaning of sec. 6662(d)(2)(C)(iii). However, see infra note 9 and the associated text.

Petitioner contends that he was not negligent because (1) he reasonably relied upon the advice of independent advisers and (2) he reasonably expected to make a profit from his purchase of the Sentinel EPE and EPS recyclers. Respondent, on the other hand, contends that petitioner's reliance on Ulanoff, Burstein, WMDI, and Boylan & Evans was not reasonable, and that it was not reasonable for petitioner to expect to profit from his purchase of the Sentinel recyclers.

Under some circumstances, a taxpayer may avoid liability for negligence if reasonable reliance on a competent professional adviser is shown. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter. David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra.

Reliance on representations by insiders or promoters has been held an inadequate defense to negligence. Goldman v.

Commissioner, supra; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985).

In his petition, petitioner contends that he was reasonable in relying on: (1) The marketing opinion of Ulanoff; (2) the technical opinion of Burstein; and (3) the legal opinions of WMDI and Boylan & Evans, dated October 15, 1981, and December 1, 1982, respectively. Respondent contends that petitioner was not reasonable in relying on Ulanoff, Burstein, and members of WMDI and Boylan & Evans because they were all investors in Sentinel recyclers.

Petitioner's testimony at trial indicates that he did not actually rely on the reports by Ulanoff and Burstein. Specifically, petitioner testified:

> I * * * hired [Ulanoff and Burstein] because I was told to hire them. I really didn't need them to tell me what the machine could do and the what -- the profit I could make. * * * Elliot Miller told me this is the way you do it. I did it.

Although petitioner contended in his petition that he relied on Ulanoff and Burstein, petitioner did not argue this point at trial. On brief, petitioner repeated: "I did not need Burstein

and Ulanoff] to tell me what the machine would do and what the profit would be." Accordingly, we find that petitioner did not in fact rely on the advice of Ulanoff and Burstein in purchasing either his Sentinel EPE recycler in 1981 or his Sentinel EPS recyclers in 1982.

Further, we find that petitioner did not rely on the legal opinion issued by WMDI in purchasing his Sentinel EPE recycler in 1981. The legal opinion issued by WMDI on October 15, 1981, was not introduced into evidence at trial, and the contents of such opinion were not disclosed at trial. We assume that because the Sentinel EPS recyclers did not exist before 1982, the legal opinion issued by WMDI on October 15, 1981, pertains to petitioner's purchase of the Sentinel EPE recycler in 1981. This being the case, petitioner could not have possibly relied on the opinion as it was issued on October 15, 1981, approximately 1 week after petitioner purchased his Sentinel EPE recycler. Thus, we find that petitioner did not, in fact, rely on the legal opinion issued by WMDI in purchasing the Sentinel EPE recycler in 1981.

Additionally, petitioner failed to argue, either on brief or at trial, that he relied on the legal opinion issued by Boylan & Evans in purchasing the Sentinel EPS recyclers. In fact, petitioner mentioned this opinion only when he was cross-examined by respondent. On the record before us, petitioner has failed to persuade us that he relied on the opinion of Boylan & Evans in

purchasing his Sentinel EPS recyclers.  Further, we fail to understand how petitioner could have carefully considered a legal opinion dated December 1, 1982, when all of the operative transactions regarding his purchase of the Sentinel EPS recyclers occurred on that same date.

In any event, even if petitioner did rely on either Ulanoff, Burstein, WMDI, or Boylan & Evans in purchasing his recyclers, that reliance would not have been reasonable.  Although petitioner is an educated individual and accomplished business executive with extensive knowledge of, and experience in, the plastics industry, none of petitioner's supposed advisers had any education or work experience in plastics materials or plastics recycling.  Neither petitioner nor his advisers consulted any independent experts to help them analyze or assess the recyclers.  Thus, we think that any reliance petitioner might have placed on any of his supposed advisers was not reasonable.

Petitioner suggests that his personal knowledge of, and expertise in, the plastics industry made it reasonable for him to research, investigate, and purchase Sentinel recyclers without seeking independent expert advice.  Indeed, petitioner was more capable of assessing the economic value of the recyclers than his supposed advisers because of his knowledge about the plastics industry and, in particular, his experience in pricing plastics processing machinery.  Experience and knowledge alone, however, do not make petitioner's actions reasonable.  For petitioner's

expertise to have made his actions reasonable, he must have conducted a meaningful investigation into the investment. For the reasons below, we do not think petitioner conducted such an investigation.

There were several factors that should have alerted petitioner to the fact that the Sentinel recyclers were overvalued. The exorbitant cost of the recyclers (i.e., $1,162,667 and $1,750,000 for the Sentinel EPE and EPS recyclers, respectively) should have made petitioner question the purchases. Here we are reminded that prior to purchasing the recyclers, petitioner had never paid more than several hundred thousand dollars for plastic processing equipment. The price of the Sentinel recyclers should have appeared particularly excessive to petitioner because there was no established market for such recyclers at the time that petitioner purchased them.

Additionally, respondent's experts identified other machines that were not only functionally equivalent to the Sentinel recyclers but also significantly less expensive. Here we recall petitioner's testimony that in determining the value of the Sentinel EPE recycler he "looked around the industry" and did not discover any machines successfully recycling expanded polyethylene. Manufacturers questioned by petitioner allegedly told him that they had "reservations" and "no firm assertions" about recycling polyethylene. Aside from this testimony, petitioner offered few details in respect of his investigation

into the Sentinel EPE recyclers.  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioner testified that he examined the Japan Repro recycler, but that, based on his observations, that machine did not produce a "commercially acceptable" product.  However, petitioner presented no evidence, other than his own conclusory and self-serving testimony, regarding what he viewed as the differences between the Japan Repro recycler and the Sentinel EPS recycler.

Other than the Japan Repro recycler, petitioner could not recall the name or model of any other recycler that he allegedly considered before purchasing the Sentinel EPS recyclers.  There is no indication in the record that petitioner surveyed the then current literature regarding recyclers in order to identify comparable recyclers and to determine the value of the Sentinel EPS recycler.  Indeed, information regarding comparable, less expensive recyclers was widely available.

We think that if a potential purchaser, especially one as technologically sophisticated as petitioner, had conducted a meaningful investigation into the Sentinel recyclers, such potential purchaser would have learned that comparable, less expensive equipment existed and that the Sentinel recyclers were overvalued.  Thus, we find that although petitioner may have been

capable of independently researching the Sentinel recyclers and forming a reasonable opinion as to their value, he did not do so.

In summary, we conclude that petitioner did not rely on advice from Ulanoff, Burstein, WMDI, or Boylan & Evans, but that even if petitioner had relied on such advice, such reliance would have been unreasonable.

We now turn to petitioner's second argument; i.e., that petitioner's investment in the Sentinel recyclers was reasonable because petitioner expected to make a profit. Specifically, petitioner projected that his recyclers could process between 200 and 400 pounds of expanded polystyrene and polyethylene per hour for 7,000 hours per year, and would earn a profit of between 20 and 30 cents per pound. Based on these calculations, petitioner projected that, with respect to both the Sentinel EPE and EPS recyclers, he would receive an annual cash flow of between $280,000 and $840,000 per machine per year (200 lbs./hr. x 7,000 hr. x $.20 profit/lb., and 400 lbs./hr. x 7,000 hours x $.30 profit/lb.).

We think that the assumptions on which petitioner based his projections were not reasonable. Lindstrom reported that in "average use situations", the Sentinel EPE recylcer recycled 200 pounds of expanded polyethylene per hour and the EPS recycler recycled between 100 and 200 pounds of expanded polystyrene per hour, roughly one-half of petitioner's estimate. We are also reminded that petitioner, because he was the 100-percent owner of

RRI, was responsible for placing many Sentinel EPS recyclers with end-users and could not place his personal recyclers in the most profitable locations. Thus, petitioner was unreasonable in his estimate of the quantity of expanded polystyrene that his recyclers could process.

Further, petitioner's assumption that he could profit between 20 and 30 cents per pound was based on his anticipation of rising oil prices and its effect on the price of plastic resins. Aside from the highly speculative nature of this assumption, respondent's expert, Grossman, testified that the plastics industry is "remarkably independent" from the petrochemical industry, and that a 300-percent rise in oil prices would result in only a 30-40 percent price increase in plastic products.

Petitioner failed to provide the Court with any details regarding his projections, simply stating that he used the same formula that he has always used in purchasing machinery. Thus, it is not apparent whether petitioner's projections accounted for expenses such as labor, transportation, and overhead. Accordingly, we have insufficient information with respect to petitioner's projections to conclude that they were reasonable.

Finally, several independent factors persuade us that petitioner was not particularly concerned with earning a profit from his recyclers. First, only 14 months after petitioner purchased his Sentinel EPE recycler, he purchased two Sentinel

EPS recyclers. It is peculiar that, although petitioner had yet to make a profit from his purchase of a Sentinel EPE recycler, he nevertheless continued to purchase additional, more expensive recyclers, more than doubling his investment.

Second, petitioner has presented no evidence that he made a serious effort to monitor his investment in the Sentinel recyclers. At trial, petitioner could not recall the names of the companies with which he placed his machines.

Third, petitioner did not know the whereabouts of his recyclers at the time of trial, stating that he had "abandoned" the recyclers because PI failed to maintain them. Petitioner testified that he did not profit from his recyclers because of continual repair problems and PI's failure to maintain and repair the machines as agreed. It would seem to us that a $4,662,667 investment would warrant repair and maintenance, even if such repairs were not performed by PI as initially agreed.

Taking all of the above factors into consideration, we think it is more likely than not that petitioner purchased the Sentinel recyclers in an effort to generate tax benefits rather than to make a profit.[9]

---

[9] Here we are reminded that petitioner learned about the Sentinel recyclers after contacting Miller in an effort to locate equipment that would enable petitioner to take advantage of tax benefits.

Although not directly germane to our conclusion set forth in the text, supra, we nevertheless note that petitioner has

(continued...)

In summary, we reject petitioner's contention that he reasonably expected to profit from the Sentinel recyclers and that he reasonably relied on advice from Ulanoff, Burstein, WMDI and Boylan & Evans. Rather, we conclude that petitioner failed to exercise due care in claiming the deductions and tax credits related to the purchase of the Sentinel recyclers. Accordingly, petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence for 1989 and 1990.

E.  Conclusion

Because we have found that a substantial valuation misstatement and substantial understatement of income tax exist for 1989, and further because we have found that petitioner was negligent in both 1989 and 1990, petitioner is liable for the accuracy-related penalties under section 6662(a) for 1989 and 1990 as determined by respondent.

To reflect the foregoing, as well as the parties' Stipulation of Settled Issues,

<u>Decisions will be entered for respondent</u>.

---

[9](...continued) invested in tax shelters including movies, real estate, cattle breeding, coal mining, and computers, and that he and RRI, along with certain other individuals and entities, specifically including Miller, Bambara, and PI, were enjoined in the mid-1980's by the U.S. District Court for the District of Massachusetts in respect of what was determined to be an abusive tax shelter involving the leasing of recycling equipment. See 1985-1 C.B. 671; see also sec. 7408.